**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 13 CR 772-11 |
| | ) | |
| v. | ) | Judge Bucklo |
| | ) | |
| KYLE PAGAN, | ) | Magistrate Judge Cole |
| aka "Kal," | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

### INTRODUCTION

Defendant Kyle Pagan seeks to suppress statements he made in the wake of his arrest on October 8, 2013.[1] He claims he was drunk and high at the time, so much so that his statements were involuntary. Judge Bucklo has referred this motion to me for a report and recommendation. *See Peretz v. United States*, 501 U.S. 923, 937 (1991)(district judge may refer a motion to suppress evidence to a magistrate judge for a report and recommendation, and thereafter, if the defendant requests it, the defendant is entitled to a *de novo* review by the district court judge).[2]

While Mr. Pagan is currently represented by counsel, his version of the events leading up to and following his arrest comes from an affidavit and motion to suppress he filed, *pro se*, in May 2014. His attorney has filed a brief argument citing some case law and incorporating Mr. Pagan's

---

[1] Mr. Pagan's brief says he was arrested on October 8, 2014. [Dkt. #485, at 1]. We assume it was in 2013.

[2] Failure to file a timely objection – within 14 days after being served with a copy of the report and recommendation – with the district court shall result in a waiver of the defendant's right to appeal. 28 U.S.C. §636(b)(1); Fed.R.Civ.P. 72(b)(2); *United States v. Hall*, 462 F.3d 684, 688 (7th Cir. 2006).

*pro se* efforts by reference. As Mr. Pagan's counsel concedes, he must show that the influence of intoxicants was so severe as to render his *Miranda* waiver and statement involuntary. A waiver or statement is involuntary only where it was obtained through police coercion or overreaching that prevented the accused from exercising his free will. *See Berghuis v. Thompkins*, –– U.S. ––, ––, 130 S.Ct. 2250, 2260 (2010)(waiver of *Miranda* rights must be voluntary, knowing, and intelligent—that is, it must be the product of a free and deliberate choice, rather than intimidation, coercion, or deception, and it must be made with a full awareness of the nature of the rights that he is abandoning and the consequences of his decision to abandon them.); *Dickerson v. United States*, 530 U.S. 428, 434 (2000); *Conner v. McBride*, 375 F.3d 643, 651 (7th Cir.2004). Intoxication is only relevant to the voluntariness inquiry if law enforcement officers reasonably should have known of its existence. *United States v. LeShore*, 543 F.3d 935, 940 (7th Cir.2008). "[W]hen the interrogating officers reasonably should have known that a suspect is under the influence of drugs or alcohol, a lesser quantum of coercion may be sufficient to call into question the voluntariness of the confession." *United States v. Haddon*, 927 F.2d 942, 946 (7th Cir.1991).

But Mr. Pagan's story about what happened when he was supposedly so drunk and high that his will was easily overborne, *see LeShore,* 543 F.3d at 940, is a copiously detailed, 6-page account of the events, one after another, that occurred from about 3 a.m. the morning of his arrest until later that day, including a recounting of the various exchanges he had with police officers and federal agents. Frankly, were he still alive, David Foster Wallace might hold his capacity for densely meticulous narrative cheap when confronted by the efforts of Mr. Pagan. All that's missing from Mr. Pagan's novella are the extensive footnotes. Simply put, given his exquisitely detailed affidavit, it goes beyond straining credulity to say that he was so intoxicated that he was incapable of

voluntarily waiving his *Miranda* right and making a statement.³

## FACTUAL BACKGROUND

Mr. Pagan claims that he was drinking alcohol and smoking synthetic marijuana until 3 a.m. the morning of his arrest. He does not indicate what he was drinking, how much, or how much K2 he had smoked, but these will be the only details he leaves out in his story. But being the most important, the motion's neglect of detail in this one area tends to undermine his claim at the outset. *See United States v. Toro*, 359 F.3d 879, 885 (7th Cir. 2004)(rejecting claim of intoxication where defendant provided no details as to how much he consumed or how heavily intoxicated he was).

Three hours later – Mr. Pagan is exact with the time that passed – his mother called him and told him that his parole agent had stopped by for a compliance check and needed to see him. Mr. Pagan recalls that the parole officer said he had an hour to contact him or a warrant would issue for his arrest for a parole violation. Mr. Pagan says he "went straight to his Mother's house" to call the parole officer. Curiously, despite being subject to a compliance check which could put him back in prison, Mr. Pagan claims he drank the rest of his alcohol and smoked the remainder of his K2 – again, he is not specific as to what kind of alcohol or how much alcohol and synthetic marijuana – on the way to his mother's house.

He does not say how far the trip was or how long, or how he traveled there. Mr. Pagan next recalls that, once he called his parole officer, he was told the officer had "18 more people to go see"

---

³ It is well documented that heavy drinking can result in memory loss. *See, e.g.,* Aaron M. White, *What Happened? Alcohol, Memory Blackouts, and the Brain*, http://pubs.niaaa.nih.gov/publications/arh27-2/186-196.htm (visited on 9/26/14). It certainly cannot result in memory enhancement. And it is beyond debate that the passage of time dulls memory. *Dickey v. Florida*, 398 U.S. 30, 42 (1970)(Brennan, J., concurring) Thus, Mr. Pagan's quite detailed memory of events occurring almost a year earlier could scarcely be of greater importance in light of his claim of him not being "in his right state of mind or possessing all his faculties" at the time of his interrogation. (*Amended Motion to Suppress*)[Dkt. #485 at 16].

and that it would few be a few hours before he could see him.  But, in the "next 5 minutes," "Agents" turned up at Mr. Pagan's mother's home.  The Agents – apparently DEA agents – handcuffed Mr. Pagan and took him to the couch, telling him he had nothing to worry about as long as there were no guns or drugs in the house.  Mr. Pagan recalls telling them, when asked who else was in the house, that his mother, step father, sister, and niece were there.

Mr. Pagan next relates a brief conversation he had with the agents regarding whether DEA agents regularly did compliance checks.  As this continued, the agents search the house, but didn't turn up anything.  The agents then told Mr. Pagan he had to go to the police station for a urine test, and took him to Homan Square police station.  Mr. Pagan remembers being walked through the hallway at the station and seeing an officer with a clipboard.  He had a brief conversation with that officer, telling him he was there for a urine test.  At that point, Mr. Pagan says he was told he was being turned over to the "Feds"; he even recalls that one of the agents "smiled and shook his head saying 'yes.'" Mr. Pagan asked why he was going to the Feds and he became angry saying the agents had lied to him about going to the station merely for a urine test.  He was upset that he hadn't been allowed to tell his mother the truth so she wouldn't worry when he didn't return home.

Mr. Pagan next recalls the agents then explaining that they had told him that because "sometimes when people get locked up with family around sometimes family members act crazy." The officer with the clipboard then told him he was being arrested for distribution.  Mr. Pagan was then fingerprinted and put into a room.  Two agents then walked in and one asked Mr. Pagan if he recognized him.  When Mr. Pagan said he didn't, the agent told him they had been watching him and listening to his phone calls for a long time.

4

Mr. Pagan claimed he hadn't been selling drugs, but the agents played some of the recorded phone calls for him. The agents then informed him "it was a 17-hour deadline before Defendant had to be in court." The agents then told him if he wanted to discuss the charges further they needed him to sign a waiver. Mr. Pagan says he agreed and signed a "WAIVER OF INITIAL APPEARANCE BEFORE THE UNITED STATES MAGISTRATE JUDGE, and the MIRANDA WAIVER."

Mr. Pagan recalls the agents then explaining the charges and asking him if he knew certain people. He says he replied that he didn't know any of them. He was asked if he would cooperate and he replied, "no." This happened a few more times and the agents left the room.

Next, Mr. Pagan specifically recalls that Chicago Police Officer Alvarado entered the room and asked him what was going on, and if anyone had talked to him. He said they had. Officer Alvarado then asked if he had talked to them, and Mr. Pagan said he hadn't. Mr. Pagan has a vivid recollection of Officer Alvarado's advice to him:

> this was the wrong time to play a hard ass, and that he has been knowing Defendant for a long time and that Defendant was a pretty good kid, Adviseing [sic] the Defendant that he needed to tell the Agents what they needed to know. Defendant replied that he didnt [sic] have anything to tell them. Officer then replied that this is not a game, that Defendant is in a lot [sic] of trouble, and Defendant needed to make the best of it, And [sic] tell Agents what they need to know. Officer advised Defendant to not protect the people that he is trying to protect, and worry about who is gonna protect Defendant. Officer advised Defendant that Defendant needed to worry about people saying that Defendant killed somebody or robbed somebody.

(Dkt. # 418, at 7). Mr. Pagan protested that he had never killed anybody, robbed anybody, or sold drugs – at least not with the people the agents were talking about.

Officer Alvarado went on at length – again, all well remembered and recounted by Mr. Pagan. The officer said, Mr. Pagan was looking at a long time in prison and Officer Alvarado didn't want to see him go down that road. He reminded Mr. Pagan about all the deals they had made and

5

breaks he had given him. Most recently, Officer Alvarado had given Mr. Pagan a break when he found drugs on him didn't include it in his incident report. In exchange, Mr. Pagan told Officer Alvarado about the location of a handgun, but was never charged with possession. Mr. Pagan told Officer Alvarado that he did, indeed, remember that deal. Mr. Pagan recounts all this in great detail.

The two continued their conversation with Officer Alvarado encouraging Mr. Pagan to cooperate and saying it was big mistake if he didn't. Mr. Pagan remembers saying he'd be lying if he told the agents anything. Mr. Pagan recalls specifically that Officer Alvarado asked whether he knew Maurice Henderson. Mr. Pagan said he did. Officer Alvarado told him that Henderson was cooperating and he should do the same. Officer Alvarado then asked Mr. Pagan, "how much time do you think that you will be looking at if I charged you with that Handgun?" Mr. Pagan responded: "first you was [sic] trying to help me now you are trying to give me more time?" Officer Alvarado told him that, with the handgun and the drugs you will be looking at least 20-25 years to life. [Dkt. #418, at 7-8].

Mr. Pagan's detailed recollection of what happened that day becomes even more meticulous here. He says he put his hands on his head and said that he had a son out there and Officer Alvarado was "trying to give me all of this time for something I know nothing about." Alvarado told Mr. Pagan that if he told him "everything that happened on Keystone" he wouldn't charge him with the handgun, and he would talk to the agents to see if he could get Mr. Pagan less time.

Mr. Pagan next recalls that, at that point, two more officers entered the room. Officer Alvarado left and came back with a pen and a note pad and asked Mr. Pagan if he was ready to talk. Mr. Pagan said he was. He went on to answer some questions, then stated that he needed time to think about things. Mr. Pagan then asked Officer Alvarado if he was sure that Mr. Pagan would get

6

some time knocked off from the current drug case. He told Mr. Pagan he would not be charged with the handgun. Officer Alvarado then said "haven't I always been a man of my word?" Mr. Pagan said this time was different. Officer Alvarado then asked Mr. Pagan if he wanted him to bring the prosecutor in to tell him that he is doing the right thing. Mr. Pagan said he would. [Dkt. # 418, at 8].

Alvarado then left and returned with the prosecutor. Mr. Pagan asked the prosecutor if he was gonna get some time "knocked off." The prosecutor replied that it was a good start, "[b]ut the case is not gonna go away." Mr. Pagan continued to give his statement to Officer Alvarado.

**ANALYSIS**

Given Mr. Pagan's astonishingly detailed narrative of a rather hectic day in his life that happened over seven months before he filed his meticulous affidavit, the argument that he was so drunk and so high at the time that his will was overborne is self-defeating.[4] Suffice it to say that his claim that he was so impaired that he was unable to act voluntarily, waive his *Miranda* rights, and provide a statement is implausible. *See United States v. Clay*, 562 Fed.Appx. 531, 533 (7th Cir. 2014)(intoxication not a factor where defendant talked at length with agents and tried to negotiate with them); *Zachary v. Finnan*, 436 Fed.Appx. 682, 684 (7th Cir. 2011)(transcript of interrogation revealed defendant was aware of what was happening, responsive to questions, and coherent despite evidence of extraordinarily high blood-alcohol concentration ).

Mr. Pagan remembers multiple conversations, specific time frames, an officer with a clipboard, etc. According to his account he negotiated with Officer Alvarado and even recalled

---

[4] If this were a civil case, it would be accurate to say that Mr. Pagan has "pled himself out of court." *Muhammad v. Oliver*, 547 F.3d 874, 878 (7th Cir. 2008).

7

asking to speak with, and speaking with, a prosecutor. *See United States v. Brown*, 664 F.3d 1115, 1117 (7th Cir. 2011)(" . . . defendant's attempts to negotiate a deal and his selective answering of questions are evidence that he understood his rights and voluntarily waived them."). Mr. Pagan remembers that the prosecutor made no promises in exchange for this statement, only that it would be a good start. *Cf. United States v. Montgomery*, 555 F.3d 623, 629 (7th Cir. 2009)("Given the right circumstances, a false promise of leniency may be sufficient to overcome a person's ability to make a rational decision about the courses open to him."). Mr. Pagan refers to what he characterizes as a threat that he would be charged with possession of a handgun if he did not cooperate. He says that he did commit that crime. So, that's not so much a threat as a clear articulation of the facts and his options. That does not render his cooperation involuntary. *See United States v. Miller*, 450 F.3d 270, 272 (7th Cir. 2006)(it is not a threat where the police have probable cause to take the action they say they will if defendant does not cooperate), *abrogated on other grounds*, *Kimbrough v. United States*, 552 U.S. 85 (2007).[5] *Compare, McGautha v. California,* 402 U.S. 183, 213 (1971)("The criminal process, like the rest of the legal system, is replete with situations requiring the making of difficult judgments as to which course to follow. Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that

---

[5] Here is a portion of what Judge Easterbrook said in *Miller*:

A choice between cooperation and freedom, on the one hand, and silence followed by custody and prosecution, on the other, is a common one. This is the real choice many suspects face whether or not the police lay it out in so many words; clear articulation of the options makes a choice better informed and thus more rather than less voluntary. That's why we held in *Johnson v. Trigg,* 28 F.3d 639 (7th Cir.1994), that a promise to release the suspect's mother from custody if he confesses does not make his statement involuntary; if the police have good ground for holding the mother, the information adds to the options at the suspect's disposal. [*Citations omitted*]. Suspects are not entitled to full information, [*Citations omitted*], but can't complain when they get it and learn that some of the options are unpalatable.450 F.3d at 272.

token always forbid requiring him to choose.")(citation and internal quotation marks omitted).

Finally, the government turned over to the defense, quite tardily it should be noted, a videotape made on the date Mr. Pagan was arrested and interviewed by the police. Defense counsel and the government, after viewing the tape, agree that there is nothing on the tape that bolsters or affects Mr. Pagan's claims, and that the court need not review the tape.

ENTERED: /s/ Jeffrey Cole
UNITED STATES MAGISTRATE JUDGE

**DATE:** 9/26/14

Specific, written objections to the Report and Recommendation must be filed with the Clerk of the District Court for the Northern District of Illinois, 219 S. Dearborn, 20th Floor, Chicago, IL 60604, within fourteen (14) days of being served with a copy of the Report and Recommendation. Failure to file specific, written objections within the specified time waives the right to appeal this Report and Recommendation. *See* Fed.R.Civ.P. 72(b)(2); 28 U.S.C. 636(b)(1)(C); *United States v. Brown*, 79 F.3d 1499, 1504, n. 4 (7th Cir. 1996); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 329 (7th Cir.1995); *Video View, Inc. v. Studio 21 Ltd.*, 797 F.2d 538, 539 (7th Cir. 1986).